IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KIMBERLY C. WICKER, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 20-4771 |
| | : | |
| KILOLO KIJAKAZI,[1] ACTING COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : : : : | |
| | : | |
| Defendant. | : | |
| | : | |

## **MEMORANDUM OPINION**

Kimberly C. Wicker ("Wicker" or "Plaintiff") seeks review, pursuant to 42 U.S.C. § 405(g), of the Commissioner of Social Security's ("Commissioner") decision denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").[2] For the reasons that follow, Wicker's Request for Review will be denied.

## I.     **FACTUAL AND PROCEDURAL BACKGROUND**

Wicker was born on July 21, 1976.  R. at 37.[3]  She has a high school education and is able to communicate in English.  Id. at 37-47.  She has previous work experience as a supervisor

---

[1]     Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ms. Kijakazi should be substituted for the former Commissioner of Social Security, Andrew Saul, as the Defendant in this action.  No further action need be taken to continue this case pursuant to Section 205(g) of the Social Security Act.  42 U.S.C. § 405(g).

[2]     In accordance with 28 U.S.C. § 636(c), the parties voluntarily consented to have the undersigned United States Magistrate Judge conduct proceedings in this case, including the entry of final judgment.  See Doc. Nos. 3, 4.

[3]     Citations to the administrative record will be indicated by "R." followed by the page number.

and caretaker. Id. at 23. On October 29, 2018, Wicker filed applications for DIB and SSI pursuant to Titles II and XVI of the Social Security Act. Id. at 16. She alleged that she became disabled on October 19, 2018, due to chronic pain, anxiety and depression, cervical disc degeneration, restless leg syndrome, headaches, and asthma. Id. at 37-44, 189, 214. These applications were initially denied on January 24, 2019. Id. at 16. Wicker then filed a written request for a hearing on February 21, 2019. Id. A hearing regarding the denial of her applications was held before an Administrative Law Judge ("ALJ") on August 7, 2019. Id. On November 5, 2019, the ALJ issued an opinion finding that Wicker was not disabled. Id. at 24. The Appeals Council denied Wicker's request for review, thereby affirming the decision of the ALJ as the final decision of the Commissioner. Id. at 1-4. Wicker then commenced this action in federal court.

## II.     THE ALJ'S DECISION

In his decision, the ALJ found that Wicker suffered from the following severe impairments: chronic regional pain syndrome ("CRPS")[4] and obesity. Id. at 18. The ALJ did not find that any impairment, or combination of impairments, met or medically equaled a listed impairment. Id. at 21. The ALJ determined that Wicker retained the residual functional capacity ("RFC") to perform the full range of sedentary work as defined in 20 C.F.R §§ 416.1567(a) and 416.967(a). R. at 20.

Relying on the vocational expert who appeared at the hearing, the ALJ determined that

---

[4]     The ALJ refers to Wicker's condition as "chronic regional pain syndrome." R. at 18. In her argument regarding the evaluation of this condition, Wicker relies on Social Security Ruling SSR 03-2p, which identifies the condition as Reflex Sympathetic Dystrophy Syndrome or Complex Regional Pain Syndrome. Pl.'s Br. (Doc. No. 20) at 2; "Titles II and XVI: Evaluating Cases Involving Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome," 68 FR 59971-01, 2003 WL 22380904, at *59971 (Oct. 20, 2003) [hereinafter "SSR 03-2p Notice"].

2

Wicker could perform her past work as an employment supervisor as actually and generally performed.  Id.  Accordingly, the ALJ found that Wicker was not disabled.  Id. at 24.

### III. WICKER'S REQUEST FOR REVIEW

In her Request for Review, Wicker contends that the ALJ violated the Social Security Administration's ("SSA") policy regarding completing an RFC assessment in a matter involving CRPS and failed to address several impairments she alleged.  She further contends that the ALJ's decision was constitutionally defective.

### IV. SOCIAL SECURITY STANDARD OF REVIEW

The role of the court in reviewing an administrative decision denying benefits in a Social Security matter is to uphold any factual determination made by the ALJ that is supported by "substantial evidence."  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Newhouse v. Heckler, 753 F.2d 283, 285 (3d Cir. 1985).  A reviewing court may not undertake a de novo review of the Commissioner's decision to reweigh the evidence.  Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986).  The court's scope of review is "limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact."  Schwartz v. Halter, 134 F. Supp. 2d 640, 647 (E.D. Pa. 2001).

Substantial evidence is a deferential standard of review.  See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  Substantial evidence "'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (quoting Pierce v. Underwood, 487 U.S. 552, 564-65 (1988)); Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).

It is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (internal quotation marks omitted).  The court's review is plenary as to the ALJ's application of legal standards. Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).

To prove disability, a claimant must demonstrate some medically determinable basis for a physical or mental impairment that prevents him or her from engaging in any substantial gainful activity for a 12-month period.  42 U.S.C. § 423(d)(1); accord id. § 1382c(a)(3)(A).  As explained in the applicable agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.  (iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 to subpart P of part 404 of this chapter and meets the duration requirement, we will find that you are disabled.  (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled. (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (references to other regulations omitted); accord id. § 416.920.

**V.     DISCUSSION**

    **A.     The ALJ Properly Followed the Requirements of Social Security Ruling ("SSR") 03-2p**

Wicker contends that remand is required because the ALJ failed to properly evaluate her CRPS in his findings regarding the opinions of consultative examiner David B. Klebanoff, M.D.,

4

and treating therapist Arielle Ettinger, L.S.W., and statements by third-party sources. Pl.'s Br. at 2-5. She argues that the ALJ failed to follow SSR 03-2p, which "acknowledges the difficulty inherent in evaluating a complex impairment like CRPS." Id. at 2.

In 2003, the SSA gave notice of SSR 03-2p, which explained the policies for evaluating SSI and DIB claims based on CRPS. SSR 03-2p Notice at *59971. SSR 03-2p includes the following guidance regarding step four of the disability determination, in which an assessment of the RFC is made:

> [A]ll of the individual's symptoms must be considered in deciding how such symptoms may affect functional capacities. Careful consideration must be given to the effects of pain and its treatment on an individual's capacity to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. See SSR 96-7p, "Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements" and SSR 96-8p, "Titles II and XVI: []Assessing Residual Functional Capacity in Initial Claims."
>
> Opinions from an individual's medical sources, especially treating sources, concerning the effect(s) of [CRPS] on the individual's ability to function in a sustained manner in performing work activities, or in performing activities of daily living, are important in enabling adjudicators to draw conclusions about the severity of the impairment(s) and the individual's RFC. In this regard, any information a medical source is able to provide contrasting the individual's medical condition(s) and functional capacities since the alleged onset of [CRPS] with the individual's status prior to the onset of [CRPS] is helpful to the adjudicator in evaluating the individual's impairment(s) and the resulting functional consequences.
>
> In cases involving [CRPS], third-party information, including evidence from medical practitioners who have provided services to the individual, and who may or may not be "acceptable medical sources," is often critical in deciding the individual's credibility. Information other than an individual's allegations and reports from the individual's treating sources helps to assess an individual's ability to function on a day-to-day basis and helps to depict the individual's capacities over a period of time, thus serving to establish a longitudinal picture of the individual's status.

Id. at *59975.

In an RFC assessment in a matter involving CRPS, it is "not error for the ALJ to note the

absence of objective findings" to support medical opinions. Forcinito v. Comm'r of Soc. Sec., No. 12-6940, 2014 WL 252095, at *8 (D.N.J. Jan. 23, 2014) (where it was proper for the ALJ to emphasize that a medical opinion was not supported by independent, medically acceptable findings). An ALJ can identify CRPS as a severe impairment but still determine that it does not significantly limit a claimant's ability to perform work activities. Elswick v. Saul, No. 18-1886, 2019 WL 6701725, at *5 (M.D. Pa. Aug. 30, 2019) ("'While complaints of pain are subjective by nature, the claimant's alleged resulting extreme limitations are not supported by the objective medical evidence in the record.'").

### 1. Consultative Examiner David Klebanoff, M.D.

Wicker first contends that the ALJ's finding that Dr. Klebanoff's opinion was partially persuasive was improper under SSR 03-2p. Pl.'s Br. at 3. She argues: "By focusing solely on objective findings not ordinarily associated with CRPS and rejecting an examining medical source's opinion, the ALJ violated the principles of SSR 03-2p and substituted his own lay judgment for the opinion of a medical professional." Id.

On September 17, 2019, Dr. Klebanoff opined that Wicker could sit up to eight hours in an eight-hour day, could stand and walk up to two hours in an eight-hour day, and did not require a cane to walk. R. at 1248. He further opined that Wicker could occasionally reach overhead, frequently reach in all other directions, occasionally operate foot controls with her right foot, occasionally climb stairs and ramps, and never kneel, crouch, or crawl. Id. at 1249-50.

At step four of the disability determination, the ALJ found Dr. Klebanoff's opinion "persuasive to the extent that it would limit walking and standing to sedentary work" and "not persuasive to the extent it provided other postural limitations." Id. at 23. The ALJ noted that the record contained no objective findings that would restrict Wicker's ability to reach. Id.

Here, the ALJ clearly considered Dr. Klebanoff's opinion regarding Wicker's capacity to do physical activities in a work setting, given that he found this portion of the opinion persuasive and restricted Wicker to sedentary work. Id. at 20. SSR 03-2p demands no more from the ALJ than to consider all symptoms, especially the effects of pain and its treatment, and to take note of medical opinions that contrast a claimant's status prior to CRPS and after the alleged onset of CRPS. SSR 03-2p Notice, at *59975; Elswick, 2019 WL 6701725, at *5 ("SSR 03-2p requires the ALJ to *consider* a claimant's CRPS symptoms in determining the claimant's RFC . . . that is precisely what the ALJ did in this case." (emphasis added)). Dr. Klebanoff did not and could not have offered any opinion that contrasted Wicker's pre- and post-CRPS statuses, as SSR 03-2p indicates could be "helpful" to the ALJ, SSR 03-2p Notice, at *59975, because he examined Wicker once after the alleged onset date. Contrary to Wicker's assertion that the ALJ failed to perform his duty under SSR 03-2p because he "reject[ed] an examining medical source's opinion," Pl.'s Br. at 3, the ALJ fulfilled his duty by making a finding of persuasiveness with regard to a consultative examiner's opinion, which is part of the sequential disability determination and not precluded under SSR 03-2p.

Wicker's argument that the ALJ substituted "his own lay judgment for the opinion of a medical professional" because he "focus[ed] solely on objective findings not ordinarily associated with CRPS and reject[ed] an examining medical source's opinion" also fails. Id. at 3. As discussed supra, even in the context of SSR 03-2p, an ALJ is not required to adopt the limitations of any one medical source. Determining a claimant's RFC is an administrative task to be performed by the ALJ. See Chandler v. Comm'r Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). As the Chandler court explained:

> The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations. See 20 C.F.R.

7

>§§ 404.1527(e)(1), 404.1546(c). Although treating and examining physician opinions often deserve more weight than the opinions of doctors who review records, see, e.g., 20 C.F.R. § 404.1527(d)(1)-(2), "[t]he law is clear ... that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity."

667 F.3d at 361 (quoting Brown v. Astrue, 649 F.3d 193, 197 n.2 (3d Cir. 2011)). Thus, an ALJ is not bound by the specific functional ratings set by a physician in a medical source form. See id. at 362 (ALJ could extrapolate RFC from medical evidence in the record); Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006) (ALJ may adopt RFC findings that have not been stated by physician). "Surveying the medical evidence to craft an RFC is part of the ALJ's duties." Titterington, 174 F. App'x at 11. Here, the ALJ's decision not to credit the limitations on reaching found in Dr. Klebanoff's opinion because they were inconsistent with the medical evidence of record is supported by substantial evidence.

The inconsistency of Dr. Klebanoff's opinion regarding additional postural limitations with the medical record and Wicker's activities of daily living supports the ALJ's finding of partial persuasiveness. Although Dr. Klebanoff indicated that Wicker could only occasionally reach overhead, frequently reach all other directions, and frequently push and pull, Dr. Klebanoff's examination indicated that her upper extremity strength was intact at 5/5 and there was no edema or muscle atrophy in her extremities. R. at 1245-46. Wicker stated that she can cook, clean, do laundry, shop, dress and bathe herself, and care for her two sons with limitations for standing and walking. Id. at 239-40, 1244. These medical findings and Wicker's own activities support the ALJ's finding that Dr. Klebanoff's opinion was not persuasive regarding additional postural limitations, such as reaching.

### 2. Treating Therapist Arielle Ettinger, L.S.W.

Wicker argues that the ALJ's finding that Ms. Ettinger's opinion was unpersuasive

8

violated SSR 03-2p because the ALJ "fail[ed] to acknowledge the clinical evidence underlying [the] opinion." Pl.'s Br. at 5. To support this assertion, she refers to various treatment records from Penn Behavioral Health. Id.

Since September 7, 2018, Ms. Ettinger has conducted psychotherapy sessions with Wicker every other week at Penn. R. at 1070. On June 26, 2019, Ms. Ettinger opined that Wicker had marked limitations in concentrating, moderate to marked limitations in interacting with others, and moderate limitations in adapting or managing oneself. Id. at 1083. Ms. Ettinger attributed these limitations to Wicker's pain and anxiety. Id. at 1070.

The ALJ found Ms. Ettinger's opinion unpersuasive. Id. at 22. The ALJ stated that the opinion was inconsistent with the treatment notes, which indicated that Wicker was "generally engaged, open, and responsive during therapy sessions." Id. The ALJ noted that Ms. Ettinger "apparently relied quite heavily on the subjective report of symptoms and limitations provided by [Wicker], and seemed to uncritically accept as true most, if not all, of what [Wicker] reported." Id.

Wicker emphasizes that SSR 03-2p requires "[c]areful consideration . . . be given to the effects of pain and its treatment on an individual's capacity to do sustained work-related physical and mental activities." Pl.'s Br. at 4. However, Wicker does not demonstrate how the ALJ failed to carefully consider her pain in his findings about Ms. Ettinger's medical opinion. Wicker suggests that the ALJ did not carefully consider her pain because the ALJ "dismissed" Ms. Ettinger's opinion. Id. As discussed supra in Section V.A.1., SSR 03-2p does not prohibit an ALJ from considering the persuasiveness of a medical opinion by examining objective evidence. Instead of an argument centering on SSR 03-2p, Wicker's assertion that other specific clinical evidence supports Ms. Ettinger's opinion appears to be a request that the Court reweigh

9

the evidence. This Court, however, is not authorized to reweigh the evidence de novo, Monsour Med. Ctr., 806 F.2d at 1190, but only may determine whether substantial evidence exists to support the ALJ's finding, Torres v. Barnhart, 139 F.App'x 411, 413 (3d Cir. 2005). Here, the ALJ's determination that Ms. Ettinger's opinion was unpersuasive because it was inconsistent with treatment notes is supported by substantial evidence.

Ms. Ettinger's own treatment notes regarding sessions with Wicker note that Wicker was well-groomed with an appropriate appearance, had a linear and logical thought process, had normal memory, concentration, and attention, had fair insight and judgment, and was alert and fully oriented. See, e.g., R. at 654, 663, 672, 681, 690, 933, 955, 966. Ms. Ettinger's notes include that Wicker was open, engaged, and responsive during therapy sessions. See, e.g., id. at 653, 663, 672, 681, 690, 933, 955, 966, 1066. Her notes show that the sessions' discussions covered a range of topics, including her weight, pain, childhood, family relationships, dreams, children, and worries. Id. at 672, 690, 955, 966, 1066. Wicker's general engagement with therapy and unremarkable examinations at each session are inconsistent with Ms. Ettinger's opinion regarding Wicker's limitations. Thus, the ALJ's finding that the opinion was unpersuasive is supported by substantial evidence.

### 3. Third-Party Statements

Wicker contends that the ALJ violated SSR 03-2p by "dismissing . . . third-party statements as inherently unpersuasive." Pl.'s Br. at 5. She cites SSR 03-2p's guidance that "third-party information . . . is often critical in deciding the individual's credibility" and that the information "helps to assess an individual's ability to function on a day-to-day basis and . . . depict the individual's capacities over a period of time." Pl.'s Reply Br. (Doc. No. 24) at 2 (quoting SSR 03-2p Notice, at *59975).

The record included one statement from a former co-worker, one statement from a friend, and two statements from family members. R. at 254-61, 294-96. These statements describe Wicker's activities of daily living, difficulty walking and standing, swelling in her lower extremities, and experience with medical treatment. Id.

The ALJ found these statements unpersuasive because they were "lay opinions based upon casual observations" and "potentially influenced by loyalties of family." Id. at 23. The ALJ stated that the statements did not "outweigh the accumulated medical evidence" regarding Wicker's limitations and were "less than wholly consistent." Id.

SSR 03-2p does not require ALJs to consider third-party statements in a particular way. See SSR 03-2p Notice. Instead, SSR 03-2p indicates that these statements are "often critical" to a credibility analysis—which takes place when determining if the claimant's medically determinable impairments include CRPS—and "help[] to assess" a claimant's daily functioning and capacities over a long period. Id. at *59974-75. In general in disability determinations, an ALJ is required to "consider and weigh all relevant evidence, including nonmedical evidence from spouses, parents, other relatives, friends, and neighbors." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000). Here, the ALJ specifically considered the information conveyed in the statements of Wicker's co-worker, friend, and family members. R. at 23. He acknowledged them and discussed their persuasiveness. Id. The ALJ was required to do no more by SSR 03-2p or case law. Id.; see Shaw v. Saul, No. 20-517, 2020 WL 9349685 (E.D. Pa. Oct. 28, 2020). Wicker does not explain how additional discussion of the third-party statements or greater weight afforded to the statements would have impacted the ALJ's decision. Accordingly, her argument must fail.

### B. Wicker's Argument that the ALJ's Lack of Discussion of Three Alleged Impairments Requires Remand is Without Merit

Wicker contends that remand is required because the ALJ ignored three of her alleged impairments: asthma, migraine headaches, and cervical disc degeneration. Pl.'s Br. at 6-7. She alleges that, because she received diagnoses for these conditions, the ALJ was required "to assess the[ir] severity and vocational impact." Id. at 7.

Here, the ALJ found that Wicker suffered from the severe impairments of CRPS and obesity. R. at 18. The ALJ determined that Wicker's mental impairment of an unspecified mood disorder was non-severe. Id. at 19. The opinion does not include reference to Wicker's alleged asthma, migraine headaches, and cervical disc degeneration. Id. at 16-24. Even though the ALJ did not address these three alleged impairments, this lack of discussion has no impact on the overall disability determination.

Wicker's medical records demonstrate that she has indeed been diagnosed with asthma, migraine headaches, and cervical disc degeneration. Id. at 330, 489, 751. However, a diagnosis alone does not demonstrate disability. See Foley v. Comm'r of Soc. Sec., 349 F. App'x 805, 808 (3d Cir. 2009). Wicker fails to identify evidence in the record that these diagnosed impairments required limitations greater than what the ALJ included in her RFC. See, e.g., Phillips v. Barnhart, 91 F. App'x 775, 780 (3d Cir. 2004) ("[The claimant's] argument incorrectly focuses on the diagnosis of an impairment rather than the functional limitations that result from that impairment. A diagnosis of impairment, by itself, does not establish entitlements to benefits under the Act."). In determining a claimant's RFC, the ALJ is only required to include credibly-established limitations and not every limitation alleged. Rutherford, 399 F.3d at 554. It is the claimant's burden to "prove [his or] her medical condition and [the resulting] functional limitations." Esposito v. Apfel, No. 99-771, 2000 WL 218119, at *4 (E.D. Pa. Feb. 24, 2000)

12

(citing Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Torres v. Schweiker, 682 F.2d 109, 111 (3d Cir. 1982)); see also Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (claimant bears the burden of proof at steps one through four of the sequential analysis).

      Here, Wicker fails to establish that her asthma, migraine headaches, and cervical disc degeneration resulted in additional restrictions to her RFC.  Although Wicker argues that her asthma "would have restricted her ability to work in various environments and around various respiratory irritants," Pl.'s Reply Br. at 3, Wicker has not sought treatment for asthma.  The record is devoid of any discussion of her asthma or its effects on her ability to perform the full range of sedentary work.  Instead, asthma is merely listed as a diagnosis or as part of discussion of past medical history.  R. at 389, 392, 457-58 ("Mild intermittent asthma without complication"), 798, 803, 1243, 1246.  Furthermore, Wicker contends that her migraine headaches "would have impacted her ability to remain on task and to work on a regular and sustained basis."  Pl.'s Reply Br. at 3.  However, Wicker has not consulted with a neurologist and has not tried any headache medication.  R. at 327.  Her activities of daily living suggest that she is able to remain on task, as she "spends her day reading," cleans, cooks, and shops.  Id. at 328.  Wicker also argues that her cervical disc degeneration "would have impacted her ability to reach and to use her hands and arms for grasping."  Pl.'s Reply Br. at 3.  The record does indicate that Wicker's claim that her cervical disc degeneration affects her ability to reach and to use her hands and arms for grasping.  However, medical examiners have determined that her cervical disc degeneration is "stable," her hand and finger dexterity are intact with a grip strength 5/5 bilaterally and she has the ability to button, zip, and tie, and her upper extremity strength is intact.  R. at 751, 1245-46.

Wicker's argument that the ALJ was required to discuss the impairments because Wicker received diagnoses for them is without merit. "An ALJ's failure to discuss alleged impairments is harmless, and therefore remand is not appropriate, where it would not affect the outcome of the case. Specifically, remand is not required when the ALJ fails to mention a plaintiff's diagnosis unless there is evidence that the condition limits the plaintiff's ability to do work-related activities." Rodriguez v. Astrue, No. 10-3203, 2012 WL 5494659, at *11 (E.D. Pa. Apr. 2, 2012) (citing Rutherford, 399 F.3d at 553; Berrios-Vasquez v. Massanari, No. 00-2713, 2001 WL 868666, at *7 (E.D. Pa. May 10, 2001) (finding the ALJ did not err in failing to reference plaintiff's liver disease, despite numerous laboratory tests documenting abnormal liver findings, because record did not show any work-related limitation related to the liver disease)) (internal citations omitted). No evidence supports Wicker's argument that her asthma, migraine headaches, or cervical disc degeneration limit her ability to do work-related activities. Thus, although the ALJ did not mention these diagnoses, remand is not required.

### C. Wicker Does Not Have Standing to Make a Constitutional Claim

Finally, Wicker argues that the ALJ's decision is constitutionally defective because the appointment of Andrew Saul, former Commissioner of the SSA, violated the separation of powers clause. Pl.'s Br. at 7. Wicker contends that the United States Supreme Court's decision in Seila Law LLC v. Consumer Fin. Prot. Bureau, 140 S. Ct. 2183 (2020), supports remand to "a new ALJ who does not suffer from the unconstitutional taint of having previously heard and decided this case when the ALJ had no lawful authority to do so." Pl.'s Br. at 9. Wicker does not have standing to make this claim.

In Seila Law, the Supreme Court held that "the [Consumer Financial Protection Bureau's ("CFPB")] leadership by a single individual removable only for inefficiency, neglect, or

malfeasance violates the separation of powers." 140 S. Ct. at 2197. The Court determined that the structure of the CFPB as "an independent agency led by a single Director and vested with significant executive power" had "no basis in history and no place in our constitutional structure." Id. at 2201. The Court specifically discussed the SSA while addressing the arguments of "the CFPB's defenders," stating:

> After years of litigating the agency's constitutionality, the Courts of Appeals, parties, and amici have identified "only a handful of isolated" incidents in which Congress has provided good-cause tenure to principal officers who wield power alone rather than as members of a board or commission. "[T]hese few scattered examples"—four to be exact—shed little light . . . . [T]he CFPB's defenders note that the [SSA] has been run by a single Administrator since 1994. That example, too, is comparatively recent and controversial. President Clinton questioned the constitutionality of the SSA's new single-Director structure upon signing it into law. In addition, *unlike the CFPB*, the SSA lacks the authority to bring enforcement actions against private parties. Its role is largely limited to adjudicating claims for Social Security benefits . . . . [T]hese isolated examples are modern and contested. And they do not involve regulatory or enforcement authority remotely comparable to that exercised by the CFPB. The CFPB's single-Director structure is an innovation with no foothold in history or tradition.

Id. at 2202 (internal citations omitted) (emphasis added).

To remedy the constitutional violation, the Court determined that the removal provision regarding the CFPB Director was severable "from other statutory provisions relating to the CFPB's powers and responsibilities." Id. at 2209. The Court emphasized that remedying the defect by severing the removal provision from the agency—and thus avoiding "start[ing] fresh" with "no agency at all"—was using "a scalpel rather than a bulldozer." Id. at 2210-11.

Wicker maintains that, because the Commissioner of the SSA "is the singular head of the Agency, serves for six years, and cannot be removed by the President except for cause . . . the SSA's structure is unconstitutional as it violates the separation of powers." Pl.'s Br. at 7. The parties agree that the provision limiting the President's authority to remove the Commissioner without good cause violates the separation of powers doctrine. Id.; Def.'s Br. (Doc. No. 23) at 5.

15

However, Wicker's argument for a finding of constitutional defectiveness extends to the ALJs, the rules they follow, and the Appeals Council; she states: "The ALJ's delegation of authority in this case came from Mr. Saul and is therefore constitutionally defective . . . . Similarly, the ALJ decided this case under regulations promulgated by Mr. Saul when Mr. Saul had no constitutional authority to issue those rules. All of this is just as true with respect to SSA's Appeals Council judges." Pl.'s Br. at 7-8.

Courts in the Third Circuit have not considered the applicability of Seila Law to the SSA. See, e.g., Lloyd v. Kijakazi, No. 21-568, 2021 WL 4893350, at *1 n.5 (E.D. Pa. Oct. 20, 2021) (where the Court did not address plaintiff's claim based on Seila Law because remand was appropriate on other grounds). Courts in other circuits have determined that plaintiffs' arguments applying Seila Law to ALJ decisions fail because plaintiffs could not establish standing, as no injury could be traced as a result of the Commissioner's conduct. See Standifird v. Kijakazi, No. 20CV1630, 2021 WL 5634177, at *3 (S.D. Ca. Dec. 1, 2021) ("Plaintiff has not demonstrated that she was harmed by the alleged constitutionality of 42 U.S.C. § 903(a)(3)."); Lisa Y. v. Commissioner of Soc. Sec., No. C21-5207, 2021 WL 5177363, at *7 (W.D. Wash. Nov. 8, 2021) ("[T]here is nothing showing the Commissioner or the SSA implemented new and relevant agency action that may have turned upon the President's inability to remove the Commissioner."); Boger v. Kijakazi, No. 1:20-CV-00331, 2021 WL 5023141, at *3 (W.D. N.C. Oct. 28, 2021) ("Plaintiff . . . offers no evidence to show that there is a nexus between the unconstitutional removal restriction and denial of his application for benefits."); Amanda B. v. Commissioner, No. 3:20-CV-00434, 2021 WL 4993944, at *9 (D. Or. Oct. 26, 2021) ("Plaintiff here . . . does not allege 'the SSA Commissioner took any action that is in any way related to the ALJ's decision' or the decision by the Appeals Council."); Brinkman v. Kijakazi, No. 2:21-cv-

00528, 2021 WL 4462897, at *1-2 (D. Nev. Sept. 29, 2021) ("Plaintiff does not allege facts that support a finding that her injury, the denial of disability benefits, can be or is traced to the conduct of the SSA Commissioner.").

In concluding that plaintiffs' separation of powers arguments fail, these courts relied on Collins v. Yellen, 141 S. Ct. 1761 (2021), in which the Supreme Court determined that the for-cause removal restriction for the single director of the Federal Housing Finance Agency violated the separation of powers. The Court explained that, "whenever a separation-of-powers violation occurs, any aggrieved party *with standing* may file a constitutional challenge." Id. at 1780 (emphasis added). The Court determined that, to establish Article III standing, "a plaintiff must show that it has suffered 'an injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" Id. at 1779 (quoting Lujan v. Defenders of Wildlife, 112 S. Ct. 2130, 2136 (1992)). The plaintiff in Collins suffered a "pocketbook injury" that was directly traceable to an amendment adopted by the directors of the agency that "materially changed the nature of the agreements." Id. at 1774, 1779. The Court discussed its determination of standing in Seila Law, indicating that it was sufficient in that case that "the challenger sustain[ed] injury from an executive act that allegedly exceed[ed] the official's authority." Id. at 1779. Further, in her concurrence, Justice Kagan specifically discussed the SSA and how Collins's

> remedial holding . . . should help protect agency decisions that would never have risen to the President's notice. Consider the hundreds of thousands of decisions that the [SSA] makes each year. The SSA has a single head with for-cause removal protection; so a betting person might wager that the agency's removal provision is next on the chopping block. But given the majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone. That makes sense. . . . When an agency decision would not capture a President's attention, his removal authority could not make a difference—and so no injunction should issue.

17

Id. at 1801-02 (Kagan, J., concurring).

In Lisa Y, the District Court for the Western District of Washington found that the plaintiff did not have standing to make a claim that the ALJ's decision was constitutionally defective because the plaintiff could not establish a traceable injury. 2021 WL 5177363 at *5-8. The court distinguished the injury in Collins with the plaintiff's in the matter, stating:

> In Collins, the Directors of the FHFA adopted an amendment (the "Third Amendment") to certain financial agreements that "materially changed the nature of the agreements" and resulted in the companies in which plaintiffs were shareholders transferring to the U.S. Treasury "at least $124 billion dollars more than the companies would have had to pay" under the prior form of the agreements. The plaintiffs in Collins thus had an identifiable basis to contend that but for the unconstitutional removal provision, the President may have removed and appointed a different Director who would have disapproved of the adoption (or implementation) of the Third Amendment.
>
> In contrast, there is nothing showing the Commissioner or the SSA implemented new and relevant agency action that may have turned upon the President's inability to remove the Commissioner. Plaintiff has not identified any new regulations, agency policies or directives Commissioner Saul installed that may have affected her claims. Plaintiff thus fails to show how or why § 902(a)(3) removal clause possibly harmed her.

Id. at *7 (internal citations omitted).

Here, the Commissioner argues that Wicker's claim fails under Collins. Def.'s Br. at 6-7, 9-13. The Commissioner contends that Wicker cannot trace an injury back to the allegedly constitutionally defective SSA removal clause. Id. at 11

Wicker has no standing to file a constitutional challenge to the separation of powers violation because she has not established that she sustained an injury traceable to the purportedly unconstitutional removal clause to which Commissioner Saul was subject. Instead of merely tracing her injury—the denial of disability benefits—to Commissioner Saul's ability to delegate power to ALJs and the Appeals Council in general, see Pl.'s Br. at 7-8, Wicker's burden is higher: she must be able to trace that injury to the actual unconstitutional removal clause, which

18

is the unlawful conduct in this matter.  See Collins, 141 S. Ct. at 1779 ("[F]or the purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to the 'allegedly unlawful conduct' of the defendant . . . Because the relevant action in this case is the third amendment, and because the shareholders' concrete injury flows directly from that amendment, the traceability requirement is satisfied.").

Here, Commissioner Saul did not promulgate a new action affecting or injuring Wicker like the Directors did to the shareholders in Collins.  Commissioner Saul merely occupied the Commissioner role in the SSA at the time that Seila Law was decided.  Despite Seila Law's holding regarding the unconstitutionality of the CFPB's structure, the agency continued to function as it had, given that the removal clause was the only constitutional defect—and thus the only wrongful conduct—in the case.  See Consumer Fin. Prot. Bureau v. Seila Law, 997 F.3d 837, 847 (9th Cir. 2021).  As in Seila Law, the removal provision here is severable from the function of the SSA because, if the Commissioner became removable at will by the President, the constitutional violation would disappear.  140 S. Ct. at 2209.  The actions of the entire agency are not rendered void because one section of its controlling statute is void.  Id. at 2208-11.  The SSA has remained otherwise fully operative, like the CFPB after Seila Law, reflecting the Court's desire to use a "scalpel rather than a bulldozer" in approaching a constitutional defect in an agency's structure.  Id. at 2210.

There is no indication that, if the removal clause had not been part of the SSA's controlling statute, the President would have removed Commissioner Saul and appointed a new Commissioner who would have administered Wicker's claim differently.  See Lisa Y, 2021 WL 5177363 at *7.  There is no indication that the ALJ's and Appeals Council's reviews of Wicker's claim would have been administered differently either.  These determinations are all made based

on the uncontested record and the application of governing law; Wicker has not offered any argument as to how any part of the process would have been different had the President been able to remove Commissioner Saul without cause. See Collins, 141 S. Ct. at 1802 (Kagan, J., concurring) ("When an agency decision would not capture a President's attention, his removal authority could not make a difference."). Wicker does not identify any constitutional defect in the process except for the severable removal clause. Thus, her suggestion that her own disability determination was affected by the President's ability to remove the Commissioner is an attempt to make a logical leap outside the bounds of what Collins demands.

## VI.  CONCLUSION

For the reasons set forth above, this Court finds that the ALJ's decision is supported by substantial evidence. Therefore, Plaintiff's Request for Review will be denied and dismissed. An appropriate order follows.

Dated: January 28, 2022

BY THE COURT:

*/s/ Marilyn Heffley*
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE